FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

**IN UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF GEORGIA**   OCT 0 4 2010

**ATLANTA DIVISION**   JAMES N. HATTEN, Clerk

By: _____ Deputy Clerk

~ODE~

**WARREN THOMAS**

**PLAINTIFF**                          **FEDERAL COURT**

**VS.**                                CASE NO. 1:10-CV-3162

**AMERICA'S SERVICING COMPANY**
**BAYROCK MORTGAGE CORPORATION**
**CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I**
**TRUST 2006-HE4**

**DEFENDANTS**

## NATURE OF THE ACTION

1. This case arises out of Defendants' egregious and ongoing and far reaching fraudulent schemes of multiple Assignments and Fraudulent acts in the execution, usury, and breaches of contractual and fiduciary obligations as Promissory Note "Grantee", and as Secondary Lender, and as Mortgagee or "Grantee" on the Security Deed, Mortgage Brokers," "Loan Originators," "Loan Seller(s)",  "Grantee of Pooled Assests", "Grantee or officers of Structured Investment Vehicle", "Investment Banker", "Grantee of Special Purpose Vehicle/ Issuer of Certificates of 'Asset-backed Certificates'", "Seller of 'Asset- Backed' Certificates (shares or bonds)," "Special Servicer" and Grantee, respectively, of certain mortgage loans pooled together in a trust fund.

2. The participants during the Real Estate loan "closing" transaction described herein have devised and orchestrated a scheme which knowingly, willingly, and with intent to defraud, withheld the true essence of the transaction, misinformed the buyer(s) and the public,

withheld disclosures, and converted instruments, to reap huge profits at the expense of the Plaintiff.

3. The participants during the securitization scheme described herein have devised business plans to reap huge profits at the expense of Plaintiff losing their home and other investors in certain trust funds.

4. In addition to seeking compensatory, punitive, consequential and other damages, Plaintiff seeks declaratory relief as to what (if any) party, entitled, or individual or group thereof is the owner of the Promissory Note executed at the time of the loan closing, and whether the Security Deed / Mortgage secures any obligation of the Plaintiff, and A Mandatory Injunction requiring reconveyance of the subject property to the Plaintiff or, in the alternative a Final Judgment granting Plaintiff Quiet Title in the subject property.

## FACTS

Summary of the Facts of this Case:

5. Plaintiff is the Primary Lender, Grantor, and Secondary Borrower, on the subject Promissory Notes. The Loan Seller is a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of the loan funds and the actual lender (Investors in Certificates) and underwriter (Mortgage Aggregator and Investment Banker) were other parties whose identities and receipt of fees and profits was withheld from Plaintiff by the Defendants, contrary to the requirements of Federal Law and applicable State Law.

6. Unknown to Plaintiff, the Loan Seller, acting as a principal in its relationships with the "independent appraiser" of the property and the mortgage broker and mortgage originator, induced the Plaintiff into a transaction that did not and could not meet normal underwriting

standards for a residential mortgage. The Loan Seller posed as a conventional mortgage lender thus leading Plaintiff to reasonably believe that the Loan Seller, mortgage broker, and the loan originator had an interest in the success (repayment of the loan) of the transaction that Plaintiff was induced to believe was being executed at the time of the "closing" of the subject loan transaction.

7. In fact, the Loan Seller, mortgage broker, appraiser, loan originator, title agent, escrow agent and Grantor on the Security Deed, had no financial stake (i.e., liability) in the transaction and no interest other than obtaining Plaintiff's signature on a "loan" that could never be repaid, contrary to misrepresentations and assurances from the conspiring participants in this fraudulent scheme. In fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the "loan transaction."

8. Plaintiff relied on the due diligence of the alleged "Lender" (i.e., actually the Loan Seller) in executing and accepting the closing documents. In fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluating risk of loaning money in a residential loan closing.

9. Thus no bank or other financial institution actually performing under the standards, rules and regulations governing such institutions was the "lender" which is the basis for Plaintiff's cause of claim for usury, to wit: that the inflated appraisal added an undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and

mislead the Plaintiff as to the real parties in interest and the fees generated by the production of the subject "loan transaction."

10. Their purpose was solely to collect fees, rebates, kickbacks, and profits that were never disclosed to Plaintiff and have only recently been discovered by Plaintiff through consultation with experts in securitization of residential mortgage loans, and diligent research including the filings of some parties with the Securities and Exchange Commission which disclose the normal manner of operating this fraudulent scheme.

11. The Primary Borrower/Secondary Lender, alleged "Loan" Seller Bayrock Mortgage was named as the Payee on the subject Promissory Note and the beneficiary under the mortgage terms allegedly securing the performance under the subject Note. The "Grantor" was named as the Grantor on the Security Deed executed at the time of the alleged "closing" of the "loan transaction." In accordance with State law, the Deed and terms of security were recorded in the county records. However, the Grantor of the Promissory Note was never mentioned, revealed, nor was original Promissory Note ever recorded in the County Recorder's Office records.

12. Not withstanding the above, and without the knowledge of the Plaintiff, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction."

12.1. Under the terms of these agreements, the Loan Seller received a sum of money, usually on receiving an application for a loan equal to the gross amount of the loan sought by Plaintiff.

**12.2.** Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the "Lender."

**12.3.** Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgagee or beneficiary under the Security Deed and was neither named nor disclosed - named nor disclosed in any fashion.

**12.4.** The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third party was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State or Federal authorities and/or agencies.

**13.** Some form of documentation represented by the Loan Seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the loan" transaction. In some cases the documentation included actual copies of the documents presented at   "Closing."

**13.1.** In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized."

**13.2.** Plaintiff has discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different than what could have been reported to the Mortgage Aggregator prior to the "closing."

**14.** Plaintiff does not know what version of documentation was presented to the Mortgage Aggregator and if the Mortgage Aggregator took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction

either once or more than once. Plaintiff has requested such information numerous times only to be met with complete silence and defiance from the Defendants.

15. There is no assignment of the subject mortgage in the county records, but there is a non-recorded Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement which appears to substitute the Grantee over the pooled assets for the nominal Grantee in the Security Deed.

15.1. The powers of this second Grantee were in turn transferred to either a Grantee for a Special Investment Vehicle (which performed the accounting and reporting of the pool assets) or to an investment bank Collateral Debt Obligation manager whose department performed the accounting and reporting of the pool assets.

15.2. The reporting of the pool assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms of the note such that the Promissory Note appeared to be more valuable than the initial terms of payment by the "borrower."

16. The Promissory Note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle) formed for the express purpose of holding the pooled assets under certain terms.

16.1. The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction."

**16.2.** Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known.

**17.** The Investment Banking firm arranged through payment for a false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors in much the same way as it had procured the false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of this transaction, the investor's investments were "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross collateralization agreements and overcollateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Plaintiff on the subject "loan transaction."

**18.** The pool assets, including the Plaintiffs subject "loan transaction" were pledged completely to the owners of the "asset-backed securities." The certificates were then transferred to a Seller who in turn sold the certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

**19.** If there is a holder in due course of the Plaintiffs Promissory Note arising from the subject "loan transaction" it is the investors who purchased said securities (certificates). Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured", others were paid from prepayments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal

Reserve as nonrecourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction."

**20.** It is doubtful that any of the Defendants have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part. It can only be said with certainty that these Defendants seeks to enforce loan documents for which they have already been paid in full plus illegal fees for participating in an illegal scheme. These Defendants seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full long before any delinquency or default even allegedly occurred.

**21.** In order for these Defendants to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the Promissory Note and the entire chain of title of the mortgage. They have refused to do this, despite numerous requests, leading Plaintiff to conclude that the Defendants cannot produce such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.

**22.** Plaintiff is left in the position of being in an adversary proceeding with ghosts. While these Defendants have informally offered or considered providing indemnification for any third party claims, the fact remains that any relief awarded these defendants, any standing allowed to these defendants would expose the Plaintiff to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to be the holders in

due course. Any granting of a Certificate of Title to an entity other than Plaintiff or the nominal mortgagee creates an incurable defect in title.

**23.** There is no recording of any document in the county records which predates the Defendants' attempt to initiate foreclosure and/or eviction or which would authorize them to proceed.

**Significance of REMIC**

**24.** Mortgage backed Securities (MBS) Certificates are "pass through Certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G.

**24.1.** REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e. "permitted investments") and transactions which it may not undertake (i.e. "prohibited transactions").

**24.2.** Any violation of REMIC regulations has significant tax implications for the Trust, as well as all Certificate holders. For example, any income realized by the Trust from a "prohibited transaction" is taxed at 100%.

**24.2.1.** The REMIC regulations also provide that any entity that causes the REMIC regulations to be violated is liable to the Trust and the Certificate holders for the entire amount of the tax.

**24.3.** Only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.

**24.4.** A "qualified mortgage" is an obligation (i.e. mortgage) which is principally secured by an interest in real property which (1) was transferred to the Trust on the startup date, (2) was

purchased by the REMIC Trust within 3 months after the startup date or (3) any qualified replacement mortgage.

**24.5.** Permitted investments are limited to:

**24.5.1.** Cash Flow Investments (i.e. temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the Certificate holders);

**24.5.2.** Qualified Reserve Assets (i.e. any *intangible* property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interests in the event of defaults on qualified mortgages or lower than expected returns on cash flow investments.

**24.5.2.1.** These investments are for very defined purposes and are to be passive in nature. They must be "reasonably required."

**24.5.3.** Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

**25.** In order to maintain the REMIC status, the Grantee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment." 26 U.S.C. § 806F(a)(2)(B).

**25.1.** Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgage or a Permitted Investment. 26 U.S.C. § 860F (a)(2)(B).

**25.2.** Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transaction. 26 U.S.C. § 860F (a)(1).

**25.3.** Contributions of any "property"—e.g., cash, mortgages, etc.- made to the REMIC are taxed at 100% of the contribution, except for the four following exceptions:

**25.3.1.** Contributions of any "property" to facilitate a "clean up call" (i.e. the redemption of a class)

**25.3.2.** Regular interest, when by reason of prior payments with respect to those interests.

**25.3.3.** The administrative costs associated with servicing that class outweigh the benefits

**25.3.4.** of maintaining the class). Reg. § 1.860G-2(j)(1)

**25.3.5.** Any cash payment in the nature of a guarantee, such as payments to the REMIC. Any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC TO 100% taxation, plus penalties and interest. These taxes and penalties are ultimately borne by the Certificate holders under a surety bond, letter of credit or insurance policy.

**25.3.6.** Any cash contribution during the three month period after the start-up day; and any cash contribution to a qualified reserve fund made by a holder of a residual interest.

**26.** On a monthly basis, the Investment Banking firm and/or its agents, servants or employees compiled, individually and in concert,, oversaw and approved all the information contained in the Distribution Reports and electronically sent same to certain parties.

**26.1.** Based upon research performed by experts on behalf of the Plaintiff, the data regarding the number of bankruptcies, aggregate Special Servicing Fees, and aggregate Trust Fund Expenses was routinely incomplete, false and/or misleading.

**26.2.** Further said report intentionally obfuscated the illegal allocation of payments, the failure to disclose payment, and the effect on the alleged obligation to the Plaintiff, to wit: despite numerous insurance products, credit default swaps, cross collateralization, over

collateralization and polling at multiple levels, money received by some or all of these Defendants under the pretense of it being a "Mortgage Payment" was in fact retained, reserved, applied to non-performing loans to make them appear as though they were performing loans, or paid as fees to the enterprise Defendants described in this complaint.

**26.3.** Based upon the failure of the Defendants to respond, Plaintiff has every reason to believe that the party receiving the payments, America's Servicing Company is neither the holder in due course of the note nor the owner of any rights under the mortgage provisions of the Security Deed.

**26.3.1.** Further, Plaintiff has every reason to believe that his/her payments are not being forwarded to the holder in due course of the Promissory Note nor to any authorized party.

**26.3.2.** Accordingly Plaintiff is in jeopardy, to wit: the true holder in due course and potentially dozens or even thousands of third parties could come forward claiming an unsatisfied interest in the Promissory Note and may or may not be subject to Plaintiffs various affirmative defenses and counter claims.

**26.3.3.** In fact, research has revealed that in various states, such security interests are being purchased by speculators who then seek to enforce said liability, preventing the Plaintiff from claiming the most basic defense, to wit: payment exactly as required by the terms of the Promissory Note which was cashed by the receiving party apparently with authority to do so.

**26.3.4.** Defendants have failed and refused to reveal the true source of funds for the alleged loan transaction, further preventing Plaintiff's right of three day rescission under the Truth in Lending Act because the real lender has not been revealed and therefore the Notice of Rescission by the Plaintiff has no authorized addressee.

**26.3.5.** The fact that the "loan" was table-funded without a disclosed source of funds without disclosing tens of thousands of dollars of fees all contrary to the requirements of state and federal law was withheld from Plaintiff by Defendants and continues to be withheld by them. But for the expenditure of time, money and effort on research, Plaintiff would not have discovered the various deceptions of the Defendants at the alleged loan closing.

**26.3.6.** Plaintiff alleges the closing was an "alleged loan closing" because in fact it was part of an undisclosed hidden illegal scheme to issue unregulated securities (mortgage backed securities) based upon the negotiation on non-negotiable notes, the terms of which have been changed, altered, amended or modified AFTER the execution by the Plaintiff.

**26.3.7.** Defendants then purported to "negotiate" the note by adding terms which allowed the proceeds of the note to be allocated to the payment of the notes of other borrowers and adding co-obligors as aforesaid through insurance, guarantees, additional collateralization and reserves all of which were undisclosed, as aforesaid.

**26.3.7.1.** The Promissory Note was not negotiable because it was no longer an unconditional promise to pay by the original borrower. The terms had changed, adding conditions to payment that were inherent in the "securitization" process that Defendants fraudulently promoted.

**26.3.8.** Said negotiation of Plaintiff's Promissory Note was actuality in theft of his/her identity to hide the vast number of "toxic waste mortgages, Promissory Notes and obligations that enterprise Defendants were selling through their "securitization" chain.

**26.3.8.1.** The result of this was that Promissory Notes from other borrowers wherein there was virtually no possibility of performance were disguised as being of the same class as Plaintiffs Promissory Note.

**26.3.8.2.** Thus the economics of mortgage origination changed, to wit: the worse the loan, the more money the enterprise Defendants made as long as there were enough people, like Plaintiff, whose identity was used to hide the high volume (and high profit) of toxic waste loans.

**26.3.8.3.** It was thus in the financial interest of the enterprise of the Defendants to create unrealistic and false marketing expectations, deceiving the public as a whole in specified geographical areas of the country that were identified by the enterprise Defendants as targets.

**26.3.8.4.** Since these illegal profits were not disclosed, the Plaintiff is entitled to an accounting and a pro rate share of the profits obtained by the illegal, improper and undisclosed use of his/her name, credit rating and identity.

**26.3.8.5.** Based upon the opinion of experts, Plaintiffs share of said profits would be in excess of $1 million.

**27.** The Distribution Reports are suppose to accurately reflect the "financial health of the trust," and provide Certificate holders, with important data such as the number of loans in bankruptcy, the aggregate amount of special servicing fees, and the aggregate amounts of trust fund expenses. Each and every one of these categories is essential to assess its profit and loss potential in the REMIC entity. Furthermore, this data is used by bond rating agencies to assess the value of the Certificates.

**28.** Based upon the filings and information of the Plaintiff it appears that no accurate accounting has ever been presented to anyone and that therefore the identity and status of any putative holder in due course is completely shrouded in secrecy enforced by these Defendants, their agents, servants and employees.

**28**.1. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, the far less than the original investment.

**28.2**. While the Plaintiff would never have entered into a transaction in which the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs or other income or gain should be credited on some basis to said Primary Lender and Secondary Borrowers including Plaintiff herein.

## GENERAL ALLEGATIONS

**29.**The end result of the false and misleading representations and material omissions of Defendants as to the true nature of the mortgage loan actually being processed, which said Defendants had actual knowledge of, was in direct conflict with the original Uniform Residential Loan Application, early TIL, and Plaintiff stated intentions and directions to said Defendants at the time of original application for the loan, fraudulently caused Plaintiff to execute predatory loan documents.

**30.**At no time whatsoever did Defendants ever advise Plaintiff (nor, as far as Plaintiff can determine, any "investor" in certificates of mortgage-backed securities) that:

**30.1.** The mortgage loan being processed was not in their best interest;

**30.2.** The terms of the mortgage loan being processed were less favorable than the fixed-rate loan which Defendants previously advised Plaintiff that they qualified for;

**30.3.** That the mortgage loan was an inter-temporal transaction (transaction where terms, risks, or provisions at the commencement of the transaction differ at a later time) on which Plaintiff was providing cover for Defendants' illegal activities.

**30.4.** That Plaintiff would likely be placed in a position of default, foreclosure, and deficiency judgment regardless of whether he/she met his/her loan obligations once the true lender or true holder(s) in due course appeared;

**30.5.** That the originating "lender", that being Defendant Bayrock Mortgage Corporation had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact may have and probable had already pre-sold the loan, prior to closing, to a third party mortgage aggregator pursuant to previously executed documentation (Assumption and Assignment Agreement, Pooling Services Agreement, etc. all executed prior to Plaintiffs "loan Closing."

**30.6** That the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants DOES 1-10), for the ultimate purpose of bundling the Plaintiff mortgage with hundreds or perhaps thousands of others as part of a companion, support, or other tranche in connection with the creation of a REMIC security known as a Collateralized Mortgage Obligation ("CMO"), also known as a "mortgage-backed security" to be sold by a securities firm (and which in fact ended up as collateral for Asset-Backed Securities Certificates, created the same year as the closing);

**30.7.** That the mortgage/security instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

**30.8.** That in connection with the multiple down line resale and assignment of the mortgage/security instrument and Promissory Note that assignees or purchasers of the Note may make "pay-downs" against the Note which may effect the true amount owed by the Plaintiff on the Note;

**30.9.** That a successive assignee or purchaser of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Plaintiff prior notice and consent;

**31.** As a result of the closing and in connection therewith, Defendants placed the Plaintiff into a pool of a sub-prime adjustable rate mortgage programs, with Defendants intentionally misleading Plaintiff and the other borrowers and engaging in material omissions by failing to disclose to Plaintiff and other Primary Lenders and Secondary Borrowers the fact that the nature of the mortgage loan applications had been materially changed without Plaintiffs knowledge or consent, and that Plaintiff was being placed into a pool where the usual loan was an adjustable rate mortgage program despite borrowers not being fully qualified for such a program.

**32.** Prior to the closing, Defendant Bayrock Mortgage failed to provide to Plaintiff the preliminary disclosures required by the Truth-In-Lending Act pursuant to 12 CFR (also known as and referred to herein as "Regulation Z) sec. 226.17 and 18, and failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 FR sec. 3500.6 and 35007, otherwise known as the GFE.

**33.** Defendants Bayrock Mortgage also intentionally failed and/or refused to provide Plaintiff

with various disclosures which would indicate to the Plaintiff that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TIL showed a "fixed rate" schedule of payments, but did not provide the proper disclosures of the actual contractually-due amounts and rates.

**34.** Defendants failed and/or refused to provide a HUD-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide an accurate Itemization of Amount Financed ("IOAJF"), there was no disclosure of a Yield Spread Premium ("YSP", which is required to be disclosed by the Truth-In-Lending Act) and thus no disclosure of the true cost of the loan.

**35.** As a direct and proximate result of these failures to disclose as required by the Truth-In-Lending Act, Defendant Bayrock Mortgage received a YSP in a substantial amount without preliminary disclosure, which is *a.per se* violation of 12 CFR sec. 226.4(a). 226.17 and 18(d) and (c)(I)(iii)- The YSP raised the interest rate which was completely unknown to or approved by the Plaintiff, as they did not received the required GFE or IOAF.

**36.** In addition, the completely undisclosed YSP was not disclosed by Defendant in their broker contract, which contract was blank in the area as to fees to be paid to Defendant. This is an illegal kickback in violation of 12 USC sec. 2607 as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorneys' fees.

**37.** The Amount Financed within the TIL is also understated which is a material violation of 12 CFR sec. 226.17 and 18, in addition to 15 USC sec. 1602(u), as the Amount Financed must be completely accurate with no tolerance.

**38.** Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper, and that Plaintiff received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after the closing.

**39.** Plaintiff, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and Regulations.

**40.** At all times relevant hereto, Defendants regularly extended or offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four (4) installments and was initially payable to the person the subject of the transaction, rendering Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. sec. 1602(f) and Regulation Z sec. 226.2 (a)(17).

**41.** At the closing of the subject "loan transaction", Plaintiff executed Promissory Note(s) and Security Agreement(s) in favor of Defendants as aforesaid. These transactions, designated by Defendants as a Loan, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants.

**42.** As part of the consumer credit transaction the subject of the closing, Defendants

retained a security interest in the subject property which was Plaintiff principal residential dwelling.

**43.** Defendants engaged in a pattern and practice of defrauding Plaintiff in that, during the entire life of the mortgage loan, Defendants failed to properly credit payments made; incorrectly calculated interest on the accounts; and have failed to accurately debit fees. At all times material,

**44.** Defendants had actual knowledge that the Plaintiff accounts were not accurate but that Plaintiff would make further payments based on Defendants' inaccurate accounts.

**45.** Plaintiff made payments based on the improper, inaccurate, and fraudulent representations as to Plaintiff accounts.

**46.** As a direct and proximate result of the actions of the Defendants set forth above, Plaintiff overpaid in interest.

**47.** Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

**48.** Defendants' violations were all material in nature under the Truth-In-Lending Act.

**49.** Said violations, in addition to the fact that Plaintiff did not properly receive Notices of Right to Cancel, constitute violations of 15 USC sec. 1635(a) and (b) and 12 CFR sec. 226.23(b), and are thus a legal basis for and legally extend Plaintiff right to exercise the remedy of rescission.

**50.** Defendants assigned or attempted to assign the Note and Mortgage/Security Instrument to parties who did not take these instruments in good faith or without notice that the instruments

were invalid or that Plaintiff had a claim in recoupment. Pursuant to UCC 3-302, (A)(2)(b)(c) and (f). Defendants are not a holder in due course and is thus liable to Plaintiff, individually, jointly and severally.

**51.** On information and belief and given that the consumer credit transaction was an inter-temporal transaction with multiple assignments as part of an aggregation and the creation of a REMIC tranche itself a part of a predetermined and identifiable CMO, all Defendants shared in the illegal proceeds of the transaction; conspired with each other to defraud the Plaintiff out of the proceeds of the loan; are acting in concert to wrongfully deprive the Plaintiff of their residence; acted in concert and conspiracy to essentially steal the Plaintiff home and/or convert the Plaintiff home without providing Plaintiff reasonably equivalent value in exchange; and conducted an illegal enterprise within the meaning of RICO status.

**52.** On information and belief and given the volume of residential loan transactions solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

## <u>CLAIMS FOR RELIEF</u>

### COUNT I: VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

**53.** Plaintiff reaffirm and re-allege the above paragraphs 1-52 hereinabove as if set forth more fully herein below.

**54.** In 1994, Congress enacted the Home Ownership Equity Protection Act ("HOEPA") which is codified at 15 USC see. 1639 et seq. with the intention of protecting homeowners from

predatory lending practices targeted at vulnerable consumers. HOEPA requires lenders to make certain defined disclosures and prohibits certain terms from being included in home loans. In the event of noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

55. Plaintiff are "consumers" and each Defendant is an alleged "creditor" as defined by HOEPA. In the mortgage loan transaction at issue here, Plaintiff were required to pay excessive fees, expenses, and costs which exceeded more than 10% of the amount financed.

56. Pursuant to HOEPA and specifically 15 USC sec. 1639(a)(1), each Defendant is required to make certain disclosures to the Plaintiff which are to be made conspicuously and in writing

no later than three (3) days prior to the closing.

57. In the transaction at issue, Defendants were required to make the following disclosure to Plaintiff by no later than three (3) days prior to said closing:

57.1. "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application. If you obtain this loan, the lender will have a mortgage/security deed on your home. You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."

58. Defendants violated HOEPA by numerous acts and material omissions, including but not limited to:

58.1. (a) failing to make the foregoing disclosure in a conspicuous fashion;

58.2. (b) engaging in a pattern and practice of extending credit to Plaintiff without regard to their ability to repay in violation of 15 USC sec. 1639(h).

59. By virtue of the Defendants' multiple violations of HOEPA, Plaintiff have a legal right to

rescind the consumer credit transaction, the subject of this action pursuant to 15 USC sec. 1635. This Complaint is to be construed, for these purposes, as formal and public notice of Plaintiffs Notice of Rescission of the mortgage and note.

**60.** Defendants further violated HOEPA by failing to make additional disclosures, including but not limited to Plaintiff not receiving the required disclosure of the right to rescind the transaction;

**61.** the failure of Defendants to provide an accurate TIL disclosure; and the amount financed being understated.

**62.** As a direct consequence of and in connection with Plaintiff legal and lawful exercise of their right of rescission, the true "lender" is required, within twenty (20) days of this Notice of Rescission, to:

**62.1.** (a) desist from making any claims for finance charges in the transaction;

**62.2.** (b) return all monies paid by Plaintiff in connection with the transaction to the Plaintiff;

**62.3.** (c) satisfy all security interests, including mortgagee, which were acquired in the transaction.

**63.** Upon the true "lenders" full performance of its obligations, Plaintiff shall tender all sums to which the true lender is entitled.

**64.** Based on Defendants' HOEPA violations, each of the Defendants is liable to the Plaintiff for the following, which Plaintiff demand as relief:

**64.1.** (a) rescission of the mortgage an security interest loan transaction(s);

**64.2.** (b) termination of the mortgage and security interest in the property the subject of the

mortgage loan documents created in the transaction.

**64.3.** (c) return of any money or property paid by the Plaintiff including all payments made in connection with the transactions;

**64.4.** (d) an amount of money equal to twice the finance charge in connection with the transactions;

**64.5.** (e) relinquishment of the right to retain any proceeds; and

**64.6.** (f) actual damages in an amount to be determined at trial, including

**64.7.** attorneys' fees.

## COUNT II: VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT

**65.** Plaintiff reaffirm and reallege paragraphs 1-64 above herein as if specifically set forth more fully herein below.

**66.** As mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 USC sec. 2601 et seq.

In violation of 12 USC sec. 2607 and in connection with the mortgage loan to Plaintiff, Defendants accepted charges for the rendering of real estate services which were in fact charges for other than services actually performed.

**67.** As a result of the Defendants' violations of RESPA, Defendants are liable to Plaintiff in an amount equal to three (3) times the amount of charges paid by Plaintiff for "settlement services" pursuant to 12 USC sec. 2607 (d)(2).

## COUNT III: VIOLATIONS OF FEDERAL TRUTH-IN-LENDING ACT

**68.** Plaintiff reaffirm and reallege paragraphs 1-68 above hereinabove as if set forth more fully herein below.

**69.** Defendants failed to include and disclose certain charges in the finance charge shown

on the TIL statement, which charges were imposed on Plaintiff incident to the extension

of credit to the Plaintiff and were required to be disclosed pursuant to 15 USC sec. 1605

and Regulation Z

**70.** sec. 226.4, thus resulting in an improper disclosure of finance charges in violation of 15 USC

sec. 1601 et seq.. Regulation Z sec. 226.18(d). Such undisclosed charges include a sum identified

on the Settlement Statement listing the amount financed which is different from the sum listed on

the original Promissory Note.

**71.** By calculating the annual percentage rate ("APR") based upon improperly calculated and

disclosed amounts, Defendants are in violation of 15 USC sec. 1601 et seq., Regulation Z

sec.226.18(c), 18(d),and 22.

**72.** Defendants' failure to provide the required disclosures provides Plaintiff with the

right to rescind the transaction, and Plaintiff, through this public Complaint which is

intended to be construed, for purposes of this claim, as a formal Notice of Rescission,

hereby elect to rescind the transaction.


**COUNT IV: VIOLATION OF FAIR CREDIT REPORTING ACT**


**73.** Plaintiff reaffirm and re-allege paragraphs 1-72 above as if set forth more fully herein below.

**74.** At all times material, Defendants qualified as a provider of information to the

Credit Reporting Agencies, including but not limited to Experian, Equifax, and

TransUnion, under the Federal Fair Credit Reporting Act. 65. Defendants wrongfully,

improperly, and illegally reported negative information as to the Plaintiff to one or more Credit Reporting Agencies, resulting in Plaintiff having negative information on their credit reports and the lowering of their FICO scores.

**75.** The negative information included but was not limited to an excessive amount of debt into which Plaintiff was tricked and deceived into signing.

**75.1.** Notwithstanding the above, Plaintiff has paid each and every payment on time from the time of the loan closing through the illegal acts became known.

**76.** Pursuant to 15 USC sec. 1681(s)(2)(b), Plaintiff are entitled to maintain a private cause of action against Defendants for an award of damages in an amount to be proven at the time of trial for all violations of the Fair Credit Reporting Act which caused actual damages to Plaintiff, including emotional distress and humiliation.

**77.** Plaintiff is entitled to recover damages from Defendants for negligent non-compliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681 (o).

**78.** Plaintiff are also entitled to an award of punitive damages against Defendants for their willful noncompliance with the Fair Credit Reporting Act pursuant to 15 USC sec. 1681(n)(a)(2) in an amount to be proven at time of trial.

## COUNT V: FRAUDULENT MISREPRESENTATION

**79.** Plaintiff reaffirm and reallege paragraphs 1-78 above as if set forth more fully herein below.

**80.** Defendants knowingly and intentionally concealed material information from Plaintiff which is required by Federal Statutes and Regulations to be disclosed to the Plaintiff both before and at the

closing.

**81.** Defendants also materially misrepresented material information to the Plaintiff with full knowledge by Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

**82.** Under the circumstances, the material omissions and material misrepresentations of the Defendants were malicious.

**83.** Plaintiff, not being an investment banker, securities dealer, mortgage lender, mortgage broker, or mortgage lender, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

**84.** Had Plaintiff known of the falsity of Defendants' representations, Plaintiff would not have entered into the transactions the subject of this action.

**85.** As a direct and proximate cause of the Defendants' material omissions and material misrepresentations, Plaintiff has suffered damages.

## COUNT VI: BREACH OF FIDUCIARY DUTY

**86.** Plaintiff reaffirm and reallege paragraphs 1-85 above as if set forth more fully herein below.

**87.** Defendants, by their actions in contracting to provide mortgage loan services and a loan program to Plaintiff which was not only to be best suited to the Plaintiff given their income and expenses but by which Plaintiff would also be able to satisfy their obligations without risk of losing their home, were "fiduciaries" in which Plaintiff reposed trust and confidence, especially given that Plaintiff were not and are not investment bankers, securities dealers,

mortgage lenders, mortgage brokers.

**88.** Defendants breached their fiduciary duties to the Plaintiff by fraudulently inducing Plaintiff to enter into a mortgage transaction which was contrary to the Plaintiffs stated intentions; contrary to the Plaintiffs interests; and contrary to the Plaintiff's preservation of their home.

**89.** As a direct and proximate result of the Defendants' breaches of their fiduciary duties, Plaintiff have suffered damages.

**90.** Under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Plaintiff justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

## COUNT VII: UNJUST ENRICHMENT

**91.** Plaintiff reallege and reaffirm paragraphs 1-90 above as if set forth more fully herein below.

**92.** Defendants had an implied contract with the Plaintiff to ensure that Plaintiff understood all fees which would be paid to the Defendants to obtain credit on Plaintiff behalf and to not charge any fees which were not related to the settlement of the loan and without full disclosure to Plaintiff.

**93.** Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits (including but not limited to from resale of mortgages and notes using Plaintiffs identity, credit score and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme) and

gains and YSP fee unrelated to the settlement services provided at closing.

94. Defendants have been unjustly enriched at the expense of the Plaintiff, and maintenance of the enrichment would be contrary to the rules and principles of equity.

94.1. Defendants have also been additionally enriched through the receipt of PAYMENT from third parties including but not limited to investors, insurers, other borrowers, the United States Department of the Treasury and the United States Federal Reserve.

95. Plaintiff thus demand restitution from the Defendants in the form of actual damages, exemplary damages, and attorneys' fees.

## COUNT VIII: CIVIL CONSPIRACY

96. Plaintiff reaffirm and reallege paragraphs 1-95 above as if set forth more fully herein below.

97. In connection with the application for and consummation of the mortgage loan the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal act or accomplish a legal act by unlawful means, and to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiff.

98. Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of accruing economic gains for themselves at the expense of and detriment to the Plaintiff.

99. The actions of the Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiff.

100. As a direct and proximate result of the actions of the Defendants in combination resulting in

fraud and breaches of fiduciary duties, Plaintiff has suffered damages.

101. Plaintiff thus demands an award of actual, compensatory, and punitive damages.

## COUNT IX: CIVIL RICO

102. Plaintiff reaffirm and reallege paragraphs 1-101 above as set forth more fully herein below.

103. Defendants are "persons" as defined by Code2923.31(G)., while one Defendant acted in his/her natural person capacity.

104. The conspiracy the subject of this action has existed from date of application to the present, with the injuries and damages resulting therefrom being continuing.

105. Defendants' actions and use of multiple corporate entities, multiple parties, and concerted and predetermined acts and conduct specifically designed to defraud Plaintiff constitutes an "enterprise", with the aim and objective of the enterprise being to perpetrate a fraud upon the Plaintiff through the use of intentional nondisclosure, material misrepresentation, and creation of fraudulent loan documents.

106. Each of the Defendants is an "enterprise Defendant".

107. As a direct and proximate result of the actions of the Defendants, Plaintiff has and continued to suffer damages.

**COMPLAINT TO QUIET TITLE TO REAL PROPERTY**

**108.** Plaintiff reaffirm and reallege paragraphs 1-107 above as set forth more fully herein below.

**109.** Plaintiff has sent or has caused to be sent authorized Qualified Written Requests to the only known Defendants which the said Defendants have failed and refused to answer despite demands for answers.

**110.** Without this action, neither the rescission nor the reconveyance which the Plaintiff is entitled to file (as attorney in fact for the originating/Primary Lender) and will file contemporaneously with this complaint, gives Plaintiff full and clear title to the property.

**111.** The real party in interest on the Secondary Lender side may be the owner of the asset backed security allegedly issued by the Secondary Lender, the insurer through some claim of equitable interest, or the Federal government through the United States Department of the Treasury or the Federal Reserve. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject mortgage/security interest is one. Thus Plaintiff is entitled to quiet title against Defendants, clearing title of the purported subject mortgage/security interest encumbrance.

**112.** Plaintiff is ignorant of the true names and a capacity of defendants sued herein as DOES inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when ascertained.

Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

113. Plaintiff is informed and believes and thereupon alleges that each of the Defendants claim or might claim an interest in the property adverse to plaintiff herein. However, the claim of said Defendants is without any right whatsoever, and said Defendant has no legal or equitable right, claim, or interest in said property.

114. Plaintiff therefore seeks a declaration that the title to the subject property is vested in plaintiff alone and that the defendants herein, and each of them, be declared to have no estate, right, title or interest in the subject property and that said defendants and each of them, be forever enjoined from asserting any estate, right, title or interest in the subject property adverse to plaintiff herein.

115. Plaintiff reaffirm and reallege the above paragraphs 1-114 herein above as if set forth more fully herein below. The subject alleged loan, note, and mortgage was structured so as to create the appearance of a higher value of the real property than the actual fair market value.

115.1 Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the defendants sued herein was the agent and employee of each of the remaining defendants and was at all times acting within the purpose and scope of such agency and employment.

115.2. Defendants disguised the transaction to create the appearance of the lender being a properly chartered and registered financial institution authorized to do business and to enter into the subject transaction when in fact the real party in interest was not disclosed to Plaintiff, as aforesaid, and neither were the various fees, rebates, refunds, kickbacks, profits and gains of the various parties who participated in this unlawful scheme.

**115.3.** The alleged real party in interest, i.e., the source of funding for the loan and the person to whom the note was transmitted or eventually "assigned" was neither a financial institution nor an entity or person authorized, chartered or registered to do business in this State nor to act as banking, lending or other financial institution anywhere else.

**115.4.** As such, this fraudulent scheme, (which was in actuality a plan to trick the Plaintiff into signing what would become a negotiable security used to sell unregulated securities under fraudulent and changed terms from the original note) was in fact a sham to use Plaintiffs interest in the real property to collect interest in excess of the legal rate.

**115.5.** The transaction involved a loan of money pursuant to a written agreement, and as such, subject to the rate limitation set forth under state and federal law. The "formula rate" referenced in those laws was exceeded by a factor in excess of 10 contrary to the applicable law and contrary to the requirements for disclosure under TILA and HOEPA.

**115.6.** Under Applicable law, the interest charged on this usurious mortgage prevents any collection or enforcement of principal or interest of the note, voids any security interest thereon, and entitles the Plaintiff to recovery of all money or value paid to Defendants, plus treble damages, interest, and attorney fees

**115.7.** Under Applicable Law Plaintiff are also entitled and demand a permanent injunction be entered against the Defendants (a) preventing them from taking any action or making any report in furtherance of collection on this alleged debt which was usurious, as aforesaid (b) requiring the records custodian of the county in which the alleged mortgage and other instruments are recorded to remove same from the

record, (c) allowing the filing of said order in the office of the clerk of the property records where the subject property, "Loan transaction" and any other documents relating to this transaction are located and (d) dissolving any lis pendens or notice of pendency relating to the Defendants purported claim.

### RELIEF SOUGHT

**WHEREFORE**, having set forth numerous legally sufficient causes of actions against the Defendants, Plaintiff pray for:

1. The entry of Final Judgment against all Defendants jointly and severally in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial,

2. For costs and attorneys' fees,

3. That the Court find that the transactions the subject of this action are illegal and are deemed void; that the foreclosure which was instituted be deemed and declared illegal and void and that further proceedings in connection with the foreclosure be enjoined,

4. Enter judgment against defendants and each of them, as follows:

5. For an order compelling said Defendant, and each of them, to transfer or release legal title and alleged encumbrances thereon and possession of the subject property to Plaintiff herein;

6. For a declaration and determination that Plaintiff is the rightful holder of title to the property and that Defendant herein, and each of them, be declared to have no estate, right, title or interest in said property;

7.  For a judgment forever enjoining said defendants, and each of them, from claiming any

    estate, right, title or interest in the subject property;

**8.**  For costs of suit herein incurred;

**9.**  For such other and further relief as the court may deem proper

## DEMAND FOR JURY TRIAL

Plaintiff demand trial by jury of all matters so triable as a matter of right.


_____

Warren Thomas
5162 Stone Trace
Stone Mountain, Georgia. 30083

# IN UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF GEORGIA

### ATLANTA DIVISION

WARREN THOMAS

PLAINTIFF                                    FEDERAL COURT

VS.                                          CASE NO: _____

AMERICA'S SERVICING COMPANY
BAYROCK MORTGAGE CORPORATION
CITIBANK, N.A., AS TRUSTEE FOR BEAR STEARNS ASSET BACKED SECURITIES I
TRUST 2006-HE4

DEFENDANTS

## CERTIFICATE OF SERVICE

    I do hereby certify that a true and correct copy of the foregoing document has been served upon the opposing parties by mailing a copy of the same to the opposing parties by depositing the same in the United State mail, in a properly addressed envelope, with adequate postage affixed, and addressed as follows:

AMERICA'S SERVICING COMPANY    *Served to the attorney*
3476 Stateview Blvd.
MAC # X7801-013
Fort Mill, South Carolina 29715

SHAPIRO & SWERTFGER, LLP
Attorneys for America's Servicing Company
2872 Woodcock Blvd. Suit 100
Atlanta, Georgia 30341

BAYROCK MORTGAGE CORPORATION    *Served to Registered agent*
P.O. Box 2902
Alpharetta, Georgia 30023

HAYDEN KEPNER, ESQ
Registered Agent for
BAYROCK MORTGAGE CORPORATION
1500 Candler Building
127 Peachtree Street, N.E.
Atlanta, Georgia 30303

SHAPIRO & SWERTFGER, LLP
Attorneys for Citibank
2872 Woodcock Blvd. Suit 100
Atlanta, Georgia 30341

This 4th day of October, 2010.

Respectfully,

Warren Thomas
Plaintiff

5162 Stone Trace
Stone Mountain, Georgia 30083
770-469-5500